**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 11, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

WILDCAT COAL LLC,

    Plaintiff - Appellee,

v.

PACIFIC MINERALS INC., et al.,

    Defendants - Appellants.

No. 23-8073
(D.C. No. 2:22-CV-00102-NDF)
(D. Wyo.)

_____

**ORDER**

_____

Before **TYMKOVICH**, **MORITZ**, and **CARSON**, Circuit Judges.

_____

This matter is before the court *sua sponte* to correct clerical errors on page 12 of the opinion issued on July 28, 2026. The Clerk's Office shall replace the July 28, 2026 opinion with the attached revised opinion effective *nunc pro tunc* to the date the original opinion was filed.

            Entered for the Court,

            Per Curiam

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WILDCAT COAL LLC,

    Plaintiff - Appellee,

v.

PACIFIC MINERALS INC.; IDAHO
ENERGY RESOURCES CO, doing
business together as a joint venture under
the trade name BRIDGER COAL
COMPANY,

    Defendants - Appellants.

No. 23-8073

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:22-CV-00102-NDF)**
_____

Nicole C. Hancock, Stoel Rives LLP, (Wade C. Foster, Stoel Rives LLP, Richard R. Hall,
Dorsey Whitney LLP, and Timothy S. Bishop, Joshua D. Yount, Brett E. Legner, Mayer
Brown LLP, with her on the briefs) for Appellant

Brian A. Glasser, Bailey & Glasser, LLP, (Benjamin Schwartzman, Jennifer Fahey,
Leslie A. Brueckner, Bailey & Glasser, LLP, and Mistee E. Elliott, Holly L. Tysse,
Crowley Fleck PLLP with him on the briefs) for Appellee

_____

Before **TYMKOVICH**, **MORITZ**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

Under Wyoming law, courts interpret mineral leases according to general contract principles, reading the contract as a whole and avoiding constructions that make provisions meaningless.  Wyoming courts follow the parties' intent as shown by a contract's clear and unambiguous language.

For almost thirty years, the Bridger Coal Company ("Bridger") paid production royalties to the Rock Springs Royalty Company for the coal it mined from a Wyoming mine.  But in 2020, when Bridger sought to pay an advance royalty based on production projections rather than a royalty based on actual coal mined, Wildcat Coal, LLC ("Wildcat"), Bridger's current lessor, objected.  In response, Bridger refused to pay production royalties and sought to recoup the almost three million dollars it had paid in advance royalties.  Wildcat sued, arguing that Bridger based its royalty calculations on a faulty definition of the term "Adjoining Lands" in their lease.  The district court agreed and granted Wildcat summary judgment.  In a footnote, the district court sua sponte required Bridger to recalculate all royalties paid since 1986.  Bridger appealed.

Exercising jurisdiction under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

In 1986, the Rock Springs Royalty Company ("Rock Springs") leased a nine-mile area in Sweetwater County, Wyoming (the "Nine Mile Lease") to Bridger Coal Company ("Bridger") for coal mining.  The Nine Mile Lease gave Bridger exclusive

2

rights to "explore for, mine, store, prepare, ship, and dispose of the coal in, upon, and under the Rock Springs Lands" and to build commensurate infrastructure.

In exchange, the Nine Mile Lease required Bridger mine from Rock Springs Lands at least forty-five percent of the total coal mined every five years from both Rock Springs Lands and their "Adjoining Lands."  Bridger was to pay "production royalties" on the coal it mined: twelve-and-a-half percent of the sale price of the coal, plus $2.50 per ton up to 5,814,000 tons, and then $2.25 per ton mined beyond 5,814,000 tons.  If Bridger failed to meet its five-year, forty-five percent mining-threshold requirements, the Nine Mile Lease required Bridger to pay Rock Springs an "advance royalty": twelve-and-a-half percent on forty-five percent of all estimated coal mined from Rock Springs Lands and Adjoining Lands.  The Nine Mile Lease thus insulated Rock Springs from Bridger's possible breach; either way, Rock Springs got paid.

Between 1986 and 2020, Wildcat succeeded Rock Springs as lessor and replaced Anadarko as lessor for unrelated land leases Bridger acquired from Anadarko.[1]  Bridger remained as lessee.  Bridger also entered other contracts, including one with Wildcat for a ten-mile area (the "Ten Mile Lease"), and one with the Bureau of Land Management (the "BLM Lease").  The current dispute arose between Bridger and Wildcat—the current lessor—under the Nine Mile Lease.

---

[1] For clarity, we refer to Rock Springs, Anadarko, and Wildcat as just "Wildcat" where applicable.

Bridger and Wildcat had no payment disputes under the Nine Mile Lease until 2020, when Bridger paid Wildcat its first advance royalty in lieu of a production royalty. Bridger met its forty-five percent coal-production burden every five years from 1986 until 2015 and accordingly paid Wildcat production royalties. In 2020, however, anticipating failure to meet its forty-five percent production burden, Bridger paid Wildcat an advance royalty of $2,923,309.80. Wildcat objected to Bridger's royalty calculation after receiving the payment. Bridger then reversed course. It informed Wildcat that it did not owe an advance royalty for the 2016–2020 period. Bridger explained that under the Nine Mile Lease, any production in excess of the forty-five percent production threshold from the beginning of the lease results in a production royalty credit that Bridger can apply against any future failure to meet its forty-five percent production burden. According to Bridger, it had accrued excess "credit" by paying above the forty-five percent threshold from 1986–2015, absolving it of any obligation to pay Wildcat an advance royalty for the 2016–2020 period. Bridger began withholding $2,923,309.80 in future production royalties from Wildcat to recover what it viewed as an overpayment to Wildcat. Wildcat responded that Bridger had used an incorrect definition of "Adjoining Lands" when making its calculations and actually owed Wildcat $19,149,346.99.

Wildcat sued Bridger for breach of contract. The district court sided with Wildcat on cross-motions for summary judgment. The district court found that Bridger improperly defined "Adjoining Lands" and that the term included public and private lands as well as surface and underground mining. The district court also

4

found that "Adjoining Lands" included all the land described in the BLM Lease regardless of geographic proximity.  The district court further directed, in a footnote, that Bridger recalculate all royalty payments since 1986 using the new "Adjoining Lands" definition.  Neither party had requested recalculation for the years 1986–2015, nor had they otherwise presented the issue to the district court.  Still, the district court sua sponte required Bridger to recalculate royalties beginning in 1986.

Confronted with this new directive, Bridger moved under Federal Rule of Civil Procedure 60(a) to correct what it perceived to be an error by the district court.  Bridger argued that the Nine Mile Lease's thirty-six-month protest provision barred Bridger from recalculating royalties to Wildcat from 1986–2015.  The district court denied Bridger's motion in a text-only order.  Bridger appealed.

II.

We review grants of summary judgment de novo, applying the same standard as district courts.  Tufaro v. Okla. ex rel. Bd. of Regents of Univ. of Okla., 107 F.4th 1121, 1130 (10th Cir. 2024) (citing Chase Mfg., Inc. v. Johns Manville Corp., 84 F.4th 1157, 1168 (10th Cir. 2023)).  We grant summary judgment when the moving party shows no genuine disputes of material fact exist, and that it is entitled to judgment as a matter of law.[2]  Fed. R. Civ. Pro. 56(a).  We interpret all facts and make reasonable

---

[2] When we exercise diversity jurisdiction, we apply federal procedural law and the forum state's substantive law.  Hanna v. Plumer, 380 U.S. 460, 465 (1965) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).  The parties agree that Wyoming law applies to questions of substantive law.

5

inferences in the nonmovant's favor.  Tufaro, 107 F.4th at 1131 (quoting In re EpiPen

Mktg., Sales Pracs. & Antitrust Litig., 44 F.4th 959, 980 (10th Cir. 2022)).

### III.

Bridger makes four arguments on appeal: (1) the thirty-six-month protest

period in the Nine Mile Lease absolved Bridger from recalculating its royalties to

Wildcat from 1986–2015; (2) Bridger built up credit by making payments in excess

of its contractual minimums, absolving it of paying advance royalties for 2016–2020;

(3) the term "Adjoining Lands" includes only government-leased property and

surface mining; and (4) Sections 26 and 34 of the BLM Lease are not "Adjoining

Lands."  We address each in turn.

### A.

The district court's summary judgment order sua sponte required Bridger to

"recompute production royalties which would have been payable to [Wildcat] over each

five-year period under the entire term of the Nine Mile Lease consistent with this Court's

conclusion as to what constitutes 'Adjoining Lands.'"  Bridger claims the Nine Mile

Lease "places a strict time limit on [Wildcat's] opportunity to protest or question royalty

payments and supporting statements or accounting."  Section 6(D) of the Nine Mile lease

specifies a thirty-six-month protest period for Wildcat to challenge Bridger's royalty

payments:

> Acceptance of any royalty payment under this Lease shall not prejudice
> the right of [Wildcat] to protest or question the correctness thereof;
> provided, however, each such payment made to [Wildcat] by Lessee or
> any statement or accounting in support thereof shall be presumed
> conclusively to be true and correct which [Wildcat] receives such

6

payment and/or statement or accounting, unless within the said thirty-six (36) month period [Wildcat] takes written exception thereto and makes claim on Lessee for adjustment.

If applicable, this section bars Wildcat from challenging any payment Bridger made between 1986–2015, leaving only Bridger's advance-royalty payment for the 2016–2020 period at issue.

i.

Wildcat argues Bridger waived its protest-period argument because Bridger did not raise it during summary judgment proceedings, despite it being "known and available" to Bridger beforehand.  We disagree.

A party does not waive or forfeit an argument responding to a ruling by a district court made sua sponte without notice.  Mid-Continent Cas. Co. v. Circle S Feed Store, LLC, 754 F.3d 1175, 1180 n.2 (10th Cir. 2014) (citing Kannady v. City of Kiowa, 590 F.3d 1161, 1170–71 (10th Cir. 2010)); see also Wakaya Perfection, LLC v. Youngevity Int'l, Inc., 910 F.3d 1118, 1127–28 (10th Cir. 2018) (holding that plaintiff did not forfeit argument when district court raised issue sua sponte and parties had no opportunity to address it)).

That is what occurred here.  At summary judgment, Wildcat challenged only Bridger's advance royalty calculation for 2016–2020.  It never sought recalculation of production royalties beginning in 1986.  Nor did the district court suggest before its order that its definition of "Adjoining Lands" would require a full recalculation of all payments made before the 2016–2020 period.  Because Bridger's protest

argument arose only in response to the district court's sua sponte order, Bridger did not waive or forfeit the argument.[3]  We therefore consider its merits.

ii.

Under Wyoming law, courts interpret mineral leases according to "general principles of contract interpretation," Wyoming Bd. of Land Com'rs v. Antelope Coal Co., 185 P.3d 666, 668 (Wyo. 2008) (citing Wolff v. Belco Dev. Corp., 736 P.2d 730, 732 (Wyo. 1987)), and enforce the parties' intent "when such intent is expressed in clear and unambiguous language."  Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd., 929 P.2d 1228, 1233 (Wyo. 1996) (citing Westates Const. Co. v. City of Cheyenne, 775 P.2d 502, 504 (Wyo.1989)).

In rejecting application of the protest provision, the district court authorized what the protest provision was meant to prevent: retroactive changes to calculations years after Wildcat (or its predecessor) accepted them and Bridger relied on them. The protest provision clearly and unambiguously presumes "true and correct" every royalty payment and "statement in support thereof" unless Wildcat objects within thirty-six months of the end of the year in which Bridger made the payment.  A conclusive presumption is just that: conclusive.  Woods Petroleum Corp. v. Hummel, 784 P.2d 242, 243–44 (Wyo. 1989) (applying a conclusive presumption in a contract protest period).

---

[3] Once the district court ordered recalculation of royalties beginning in 1986, Bridger raised the protest-period issue in its Rule 60(a) motion.  The district court did not reject the argument as waived or forfeited; it addressed and rejected the argument on the merits.

Wildcat, and its predecessors, could have challenged Bridger's royalty calculations from 1986–2015.  Bridger made available all records necessary to calculate mine royalties, and Wildcat regularly reviewed and audited Bridger's accounting.  Yet Wildcat did not challenge Bridger's royalty calculations until Bridger paid its first advance royalty payment in 2020.

Wildcat argues it could not challenge Bridger's calculations because, until 2020, Bridger paid royalties based on a forty-five percent production threshold, not advance royalties.  This argument fails for three reasons.

First, the Nine Mile Lease's language is clear and unequivocal.  The Nine Mile Lease requires Wildcat to challenge Bridger's payments within thirty-six months of end of the year in which Bridger made payment.  That deadline applies regardless of whether Wildcat exercised due diligence in auditing and evaluating Bridger's calculations.

Second, Wildcat could have questioned, protested, or clarified Bridger's calculations for both its production royalties and its advance royalties at any time.  The definition of "Adjoining Lands" affects both figures, yet Wildcat never questioned the forty-five percent production royalties Bridger calculated using its own definition of "Adjoining Lands."

Third, Wildcat's current challenge to the definition of "Adjoining Lands" under the Nine Mile Lease falls squarely within the protest provision.  The protest provision bars challenges not only to royalty payments but also to any "statement or accounting" made to support Bridger's calculations, which includes definitional

challenges to terms used to reach royalty sums. See Rissler, 929 P.2d at 1233 (giving effect to a clear protest period in a written contract); Woods, 784 P.2d at 244 (holding that failure to contest a payment in a contractually circumscribed period precluded a party from attempting to correct errors). Thus, even if Wildcat's interpretation of "Adjoining Lands" is correct, the protest provision forecloses any attempt to recalculate royalty payments based on that interpretation after the protest period expired. Wildcat could have challenged Bridger's interpretation of "Adjoining Lands" and accompanying royalty payments within the protest period for 1986–2015 but failed to do so. It cannot make such a challenge now.

B.

Bridger further argues that it built up credit by paying more than its contractual minimums in the years prior to 2016, absolving it of having to pay any advance royalty to Wildcat for the 2016–2020 period. The district court agreed with Bridger in its Amended Summary Judgment Order, finding the Nine Mile Lease allowed Bridger to accumulate credit for payments it made that exceeded its contractual minimums. Wildcat contends that if Bridger does not have to recalculate royalties before 2016, then it also cannot claim credit from royalties paid before that time.

But Wildcat's argument is flawed. Whether the Nine Mile Lease allows Bridger to accumulate credit is an entirely different question from whether Wildcat protested the payment amounts. As we discuss above, neither Wildcat nor its predecessor timely protested Bridger's royalty payments and supporting statements

10

or accountings from 1986 to 2015 showing that Bridger paid Wildcat more than the contractual minimum. Thus, we conclusively presume those payments and calculations are correct. And, on appeal, Wildcat does not challenge the district court's conclusion that the Nine Mile Lease entitled Bridger to payment credit based on the amount Bridger paid to Wildcat exceeding the contractual minimum for the years prior to 2016. Nor does Wildcat challenge the district court's conclusion that Bridger can apply such credit to any future five-year period. Wildcat, therefore, effectively conceded that the credit exists and that Bridger can apply such credit to its advance royalty payment for 2016–2020.

Thus, we conclude Bridger may withhold payment equal to the amount of credit accumulated from payments in excess of its contractual minimums.

## C.

The district court found that "Adjoining Lands" included both publicly and privately leased lands, as well as surface and underground mining on those lands. Recital 3 of the Nine Mile Lease reads: "Said leases and permits and any contiguous leases or permits acquired hereafter, and the land covered thereby are hereinafter referred to as 'Adjoining Lands.'" The district court did not err when it concluded the contract's meaning was plain on its face.

Under Wyoming law, courts interpret contracts according to the parties' intent. To do so, courts give the contract's terms the plain meaning a reasonable person would assign them. Doctors' Co. v. Insurance Corp. of Am., 864 P.2d 1018, 1023 (Wyo. 1993) (citing Worthington v. State, 598 P.2d 796, 806 (Wyo. 1979); Wilson v.

11

Hawkeye Casualty Co., 215 P.2d 867, 873–74 (Wyo. 1950)).  We consider contracts

objectively, Ultra Res., Inc. v. Hartman, 226 P.3d 889, 905 (Wyo. 2010) (citing

Omohundro v. Sullivan, 202 P.3d 1077, 1084–85 (Wyo. 2009)), and as whole, True Oil

Co. v. Sinclair Oil Corp., 771 P.2d 781, 790 (Wyo. 1989) (citing Kost v. First Nat. Bank

of Greybull, 684 P.2d 819, 823 (Wyo. 1984); Rouse v. Munroe, 658 P.2d 74 (Wyo.

1983)).  We give weight to "the practical construction put upon [a contract] by the

parties" only when the meaning of the contract is "doubtful on its face."  Id. 771 P.2d

at 792 (quoting Rohrbaugh v. Mokler, 188 P. 448, 450 (Wyo. 1920)).

i.

The district court interpreted "Adjoining Lands" to include lands leased from

both the government and private actors.  Bridger argues that Section 15 of the Nine

Mile Lease limits the word "any" in Recital 3 of the Nine Mile Lease to include only

publicly leased lands.  Wildcat argues "Adjoining Lands" encompass both publicly

and privately leased lands because the word "any" is an all-inclusive term meaning

"all or every."

We agree with Wildcat on this issue.  Reading Recital 3 alongside Section 15

of the Nine Mile Lease, as Bridger urges us to do, we are not convinced that the term

"any lands" as used in the Nine Mile Lease excludes private lands.  Section 15 of the

Nine Mile Lease reads:

> In the event [Bridger] shall at any time desire to surrender all or any of
> the leases on Adjoining Lands to the United States Government or the
> State of Wyoming, [Bridger] shall give written notice to [Wildcat] of its
> intention to make such surrender.

12

Section 15 provides the process by which Bridger— if it so chooses—may surrender its government-leased lands back to the government; it does not mandate any process for lands leased from a private party.  Just because a portion of Section 15 deals exclusively with publicly owned lands does not mean the Nine Mile Lease excludes privately owned lands as "Adjoining Lands."

At the time of contracting, Bridger leased only public lands around the Nine Mile Lease.  Bridger argues Section 15's surrender provision would be inoperable if "any" included privately leased lands because Bridger cannot surrender private leases to the United States government or the State of Wyoming.

But we deal with the plain language of the lease first, and the plain language does not exclude private lands from the "Adjoining Lands."  On its face, Section 15 simply specifies the notice it requires Bridger give to Wildcat should it choose to surrender lands to the government.  It specifies no set process by which Bridger must surrender privately owned leases, regardless of whether Bridger leases any land from private owners.  Thus, contrary to Bridger's position, reading "any" in Recital 3 to include public and private leases does not render Section 15 meaningless.  Section 15 simply does not address the definition of "Adjoining Lands."  Therefore, including private lands in the definition of "Adjoining Lands" does not offend Section 15.  The district court did not err when it found "Adjoining Lands" encompassed publicly and privately leased lands.

ii.

13

The parties also dispute whether "Adjoining Lands" includes "lands used for underground mining" activities.  Bridger relies on Section 26 of the Ten Mile Lease to argue that "Adjoining Lands" does not include such lands.  We disagree.

In Wyoming, documents that incorporate others by reference constructively "form a single instrument" with their referenced documents.  Knight v. TCB Constr. & Design, LLC, 248 P.3d 178, 182 (Wyo. 2011).  Section 26 of the Ten Mile Lease states:

> The terms of this Lease govern all operations of Lessee conducted in regards to the underground portion of the Lease Premises.  The terms of that certain "Mining Lease of Coal Lands Nine Mile Draw Area, (Revised and Restated Effective January 1, 1986)" between the parties governs mining operations in connection with the surface mining operations existing on the Execution Date, if any, within the Leased Premises.

This Section clarifies which lease governs particular mining operations on certain lands.  It explains that the Nine Mile Lease will govern surface mining in the area above the Ten Mile Lease, and the terms of the Ten Mile Lease will govern underground mining on the area beneath.  But nothing in Section 26 purports to define, modify, or limit the term "Adjoining Lands" in the Nine Mile Lease.  The Nine Mile Lease separately defines what constitutes "Adjoining Lands" for purposes of its royalty provisions.  And as we discuss above, the definition of "Adjoining Lands" in the Nine Mile Lease is broad.  The term encompasses "*any* contiguous leases or permits acquired hereafter, and the land covered thereby."  It does not limit "Adjoining Lands" to only surface mining operations.  Because Section 26 of the Ten

14

Mile Lease does not speak to "Adjoining Lands" at all, it provides no basis for limiting the clear definition of the term under the Nine Mile Lease.

Bridger's interpretation would require us to read a limitation into Recital 3 of the Nine Mile Lease that does not appear anywhere in either the Nine Mile or Ten Mile Lease. We will not do so. See Rafter J. Ranch Homeowner's Ass'n v. Stage Stop, Inc., 558 P.3d 562, 572 (Wyo. 2024) ("Our rules of contract interpretation restrict us to the four corners of a plain and unambiguous contract and do not allow insertion of words under the guise of interpretation."). Thus, the district court did not err when it refused to exclude "lands used for underground mining" from the definition of "Adjoining Lands."

### D.

Lastly, the parties dispute whether specific lands in the BLM Lease qualify as "Adjoining Lands." The BLM Lease includes three parcels: Sections 6, 26, and 34. The parties agree that one section, Section 6, is geographically contiguous to the Rock Springs Lands and the other two sections, Sections 26 and 34, are not. Bridger argues that Sections 26 and 34 do not qualify as "Adjoining Lands" because they are not geographically contiguous with the Rock Springs Lands. We again disagree.

Recital 3 does not refer to "contiguous lands." Instead, it refers to "contiguous *leases or permits*." Thus, under the plain language of Recital 3, the threshold inquiry is whether the *lease or permit* is contiguous to the Rock Springs Lands. That is, whether the lease or permit includes any land contiguous to the Rock Springs Land. If it does, the definition of Adjoining Lands includes all "the land covered thereby."

15

Had the parties intended to limit "Adjoining Lands" to geographically contiguous land, they could have defined the term to include only "contiguous lands" or "lands contiguous to the Rock Springs Lands." They did not.

The BLM Lease is a contiguous lease or permit because it contains land contiguous to Rock Springs Lands. Therefore, the all the BLM Lease lands, including Sections 26 and 34, qualify as "Adjoining Lands" under Recital 3 of the Nine Mile Lease, regardless of whether the lands are geographically contiguous with the Rock Springs Lands or not. Bridger must include these lands in its royalty calculations.[4]

Taken in its entirety, then, "Adjoining Lands" in the Nine Mile, Ten Mile, and BLM Leases covers surface and subsurface mining on any geographically contiguous lands or geographically non-contiguous lands described in geographically contiguous leases.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with this opinion.

---

[4] If we accepted Bridger's theory that "Adjoining Lands" included only geographically contiguous land, then the phrase "the land covered thereby" would be meaningless—a proposition Wyoming courts reject. See Mills, 701 P.2d at 822 ("Courts must construe a contract as a whole, avoiding constructions which would render a provision meaningless.").